EXECUTION COPY

## ASSET PURCHASE AGREEMENT

·THIS ASSET PURCHASE AGREEMENT (the "Agreement") is executed this ⟨⟨⟩⟩ day of July, 2010 (the "Closing"), by and among KePro Acquisitions Inc., a Pennsylvania corporation (the "Buyer"), Preferred Physicians Healthcare Alliance, L.C., a Florida limited liability company ("Seller"). Edward Cabrera, M.D., an individual residing in the state of Florida ("Cabrera"), and Dianna Noecker, R.N., an individual residing in the state of Florida ("Noecker") (each a "Member" and together the "Members") join in this Agreement for purposes of specific sections and deliveries only as noted below. Each of the above is a "party" to this Agreement and all together are the "parties" hereto.

## RECITALS

A.     Seller operates a business which provides the following services: Utilization Management, Case Management, Disease Management, Health Screening, Health Risk Appraisal, Self Health Management Tools and other Wellness Programs to Health Care Plan Plans, Third Party Administrators, Employers and Payors, Brokers and other entities (the "Business").

B.     Subject to and on the terms and conditions set forth herein, Seller desires to sell and assign to Buyer, and Buyer desires to purchase from Seller, certain of the assets, properties, and rights used or held for use in the Business and to assume certain specified liabilities related to the Business.

C.     In conjunction therewith, Seller and Buyer desire to take such necessary actions so as to transfer to Buyer the assets relating to the Business, all as more particularly set forth herein.

D.     Some defined terms are set forth on ▓▓▓▓▓▓▓▓ hereto.

NOW, THEREFORE, in consideration of the mutual covenants, conditions and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows intending to·be legally bound:

## 1.     PURCHASE AND SALE OF ASSETS; ASSUMPTION OF CERTAIN LIABILITIES.

1.1     Sale and Assignment.  Subject to the terms and conditions hereof, and in reliance upon the representations, warranties and agreements set forth herein, simultaneously with the execution and delivery of this Agreement, Seller hereby sells, transfers, conveys, assigns and delivers to Buyer without any reservation of rights and free and clear of any Liens or other encumbrances, and Buyer hereby purchases and acquires from Seller, all rights, title and interest of Seller in and to the Purchased Assets,

## EXHIBIT "A"

as defined below. To the extent that any rights, title or interest in any of the Purchased Assets is held or controlled by or has vested in any parent company, subsidiary, affiliate or predecessor of Seller ("Seller Parties"), Seller hereby sells, transfers, conveys, assigns and delivers such rights, title and interest to Buyer, with no reservation of rights by Seller Parties and free and clear of any Liens or other encumbrances.

        1.2     The Purchased Assets. The Purchased Assets consist of certain of the assets and properties owned, held, or controlled by Seller or Seller Parties with respect to the Business, including, without limitation, the following assets and rights existing as of the Closing (collectively, the "Purchased Assets"):

1.2.1 The Med Manager and Med Manager Mobile ("M3") Software and all prior versions thereof by whatever name in source code and object code/compiled code, whether completed or as work in progress, and including all customized versions as described in Schedule 1.2.1 hereto and production and non-production environments and platforms of the foregoing (collectively, the "Software");

1.2.2 All health assessments, questionnaires, guidelines, clinical manuals, user manuals, data, content, content rights, content libraries, courseware, training materials, forms and templates, and health management and learning modules developed, acquired, used or held for use in connection with the Software and related end user consents (collectively, the "Content");

1.2.3 All tools, content management systems and reporting systems developed, used or held for use in connection with the Business, if any (the "Tools");

1.2.4 All web pages (dynamic or static), portals, web designs, layouts, web libraries, business rules, algorithms, database structures and designs, engines, frameworks, scripts, specifications, interfaces and links and any other technical artifact relating to any of the foregoing Purchased Assets, and all URLs and domain names held or used in connection with any of the foregoing (the "Web Artifacts"), including those on Schedule 1.2.4 hereof;

1.2.5 All work in progress by or for the Business, including any completed work and work in progress and any third party contractors for the Business or at the request of Seller (the "Work in Progress");

1.2.6 All source code, object code, compiled code and other executables relating to any of the foregoing, for all existing platforms and environments, including the current and all existing prior versions thereof, and all code annotations with respect thereto (the "Code Base");

1.2.7 All logs, manuals, documentation, maintenance and support information, development information, "as built" documentation, downloads, product descriptions, product designs, testing data, research, and other technical or engineering information and data, in whatever medium, with respect to any of the Purchased Assets ("Technical Information");

1.2.8 The business, sales and technical files, customer or prospect lists, marketing, advertising and promotional materials, incentive programs and the

materials associated with them, telephone numbers and other business and technical information and associated business practices of the Business ("Business Information");

1.2.9 All existing back-ups of any of the foregoing Purchased Assets ("Back-Ups");

1.2.10 All other proprietary know-how, software and technology of Seller or a Seller Party that is developed, used or held for use principally by the Business, including any software, portals, web assets and rights acquired by Seller ("Other Technology");

1.2.11 All patches, fixes, updates, enhancements, improvements, modifications, extensions and derivative works of the Purchased Assets made or acquired by Seller, any Seller Party or their respective contractors and agents (the "Improvements");

1.2.12 Subject to any limitations set forth in Schedule 1.2.12, any brands, trademarks, logos, slogans and trade dress used in connection with the Business, including any and all existing rights to "Med Manager" and "Med Manager Mobile" in the context of the Business, and all the goodwill embodied therein ("Brands");

1.2.13 The corporate or trade name "Preferred Physicians Healthcare Alliance, L.C.";

1.2.14 All Intellectual Property Rights embodied in or attendant to any of the Purchased Assets, including trade secret rights, copyrights and rights to patentable inventions anywhere in and to the Software, the Content, the Tools, the Web Artifacts, the Code Base, the Work in Progress, and the Improvements, and any existing registrations, counsel opinions, prosecution files and governmental issuances with respect to any such Intellectual Property Rights, if any (collectively, the "IP Rights");

1.2.15 All inventions conceived, developed or first reduced to practice by or on behalf of Seller or a Seller Party, or their respective contractors and agents, relating to the Business, and the Intellectual Property Rights attendant to or embodied in any of the foregoing anywhere (the "Inventions");

1.2.16 All assignments and other grants of ownership or rights from employees and other third parties relating to any Purchased Assets or the related Intellectual Property Rights, including without limitation those set forth in Schedule 1.2.17 hereto (the "Assignments");

1.2.17 The sole and exclusive right to file for and prosecute any applications to register or protect the IP Rights, all rights to claim priority, and to hold any patents and other registrations which may be granted therefor, including any and all divisions, continuations, in whole or in part, substitutions, renewals, reissues, reexaminations, and extensions thereof, and all national, foreign counterpart and treaty applications claiming priority therefrom;

1.2.18  The exclusive and sole right to sue and receive any recoveries for any past, present and future infringement or misappropriation by others of the IP Rights or the Inventions;

1.2.19  All of the contracts, agreements, leases and similar arrangements identified on Schedule 1.2.20 hereto (the "Assigned Contracts");

1.2.20  All copies and embodiments of the foregoing Purchased Assets, including the media in which any of the Purchased Assets is embodied;

1.2.21  The Furniture, Furnishings and Equipment listed on Schedule 1.2.22 including servers, switches plus PBK, IVR, PC's, laptops, printers, copiers, phone sets and supporting software, all web servers where the code base resides (but excluding any data, content, or software which reside there that is not part of the Purchased Assets) (collectively, the "Furniture, Furnishings and Equipment"), in their existing condition; and

1.2.22  All accounts receivable of Seller relating to any work to performed after Closing for which payment has not yet become due or for which payment has not yet been received, including the accounts receivable, as set forth on Schedule 1.2.23 (the "Assigned Accounts Receivable"), and the right to invoice and collect and retain any amounts collected with respect to the foregoing.

   1.3 Excluded Assets. Seller is not selling, conveying, assigning or transferring any asset not identified above, bank accounts, accounts receivable for work performed by Seller prior to Closing as set forth on Schedule 1.3 (the "Retained Accounts Receivable"), cash in hand, books and records of the Seller and personal property of Members listed on Schedule 1.3 hereto (the "Excluded Assets") (except to the extent set forth in Section 2 and Section 6 below).

   1.4 No Assumption of Liabilities. The Purchased Assets are being transferred or otherwise conveyed and granted to Buyer free and clear of all Liabilities. Except with respect to obligations to be performed by Seller after the Closing under or in connection with the Assigned Contracts or as specifically identified in Schedule 1.4, Buyer does not and shall not assume any Liabilities of Seller relating to the Business or the Purchased Assets or otherwise, whether accrued, absolute, contingent or otherwise. Without limitation of the foregoing, Buyer shall not be liable for any Liabilities relating to or arising from (a) the ownership, possession, development, use, sale, distribution, licensing or modification of any of the Purchased Assets (or products and services based on the foregoing) prior to the Closing by Seller  or any of its agents, contractors, employees, customers, collaborators and licensees, (b) any obligation or duty under any contracts of Seller, except for obligations under the Assigned Contracts to be performed after the Closing under or in connection with the Assigned Contracts, (c) any asset, property or right not expressly purchased by Buyer under this Agreement, (d) any taxes that are attributable or relating to the Purchased Assets or the Business or which may be applicable because of Seller's sale of the Purchased Assets to Buyer, (e) any debt obligations, or (f) any claims by Seller's directors, officers, employees, shareholders, members or agents relating to this Agreement or its performance or consummation, or

any claims by any of them relating to or arising out of their employment or engagement as contractors (including any modification or termination thereof), any employment or contractor agreement, or any liabilities arising out of or related to any employee benefit plan, accrued vacation, unpaid salary or other entitlement.

1.5 <u>Delivery of Assets; Back-Ups</u>. Seller shall deliver, or shall cause to be delivered, to Buyer the Purchased Assets as of the Closing. Prior to Closing, the Buyer and Seller shall cooperate to create Back Ups of the Software as deemed necessary and appropriate by the parties. Such Back Ups shall be reviewed by the parties prior to Closing to confirm that the software, data or content in such Back-Ups have not been corrupted and are in format agreeable to the parties. Such Back Ups shall be held by Seller in escrow and delivered to Buyer along with the other Purchased Assets at Closing.

1.6 <u>Personnel Other Than the Members Whose Employment Will Be Governed By The Employment Agreements Set Forth In</u> ████████████. No employees or other personnel are being transferred from Seller to Buyer as a part of this Agreement. Seller agrees that Buyer or Buyer's affiliated entities may, in their sole discretion, hire as an employee or engage as a contractor any or all the individuals or contractors who have at any time in the past performed any work in connection with the Business (the "<u>Former Personnel</u>"). To the extent any of these individuals is obligated to Seller or a Seller Party to any confidentiality or non-disclosure agreement, non-compete restriction, or Intellectual Property Rights agreement, Seller and Seller Parties and their respective successors covenant and agree that it/they will not seek to prohibit any such hiring or engagement on the basis of such agreements/restrictions or to enforce the provisions of such agreements/restrictions to prevent, limit or curtail the use of or the work by such personnel with respect to Buyer, Buyer's affiliates or their respective successors, or the disclosure of any information or rights that related to the Business or the Purchased Assets.

1.7 <u>Non-Assignable Contracts</u>. To the extent that the assignment or transfer of any of the Assigned Contracts to Buyer pursuant to this Agreement shall require the consent of any client, this Agreement shall not constitute a contract to assign the same or an attempt at assignment or transfer if, absent such consent, such transfer would constitute a breach of such Contract, as more fully described in paragraph 2 below. Seller and Buyer shall cooperate and agree to use their respective reasonable best efforts to obtain any consent necessary to such assignment or transfer after Closing and to collect all amounts due pursuant to such Assigned Contracts. In the event, the parties determine that they are unable to obtain such consents, the parties shall cooperate in terminating such Assigned Contract (the "Terminated Contract(s)"); provided, that during the period between Closing and termination, Buyer shall service all such Assigned Contracts and be entitled to all revenue related thereto; and, provided further, that Buyer shall terminate such Assigned Contract within 90 days of Closing unless at Buyers request, Seller agrees to extend such 90 day period, in Seller's sole discretion. The Seller shall indemnify and hold the Buyer harmless with respect to fifty percent (50%) of any loss of revenue incurred by Buyer for services rendered by the

Buyer under Terminated Contracts after the expiration of one (1) month after the date of Closing as a result of a claim by any client to a Terminated Contract that has not consented to the Assignment (where such consent is required pursuant to such Terminated Contract) that the absence of such consent negates the Client's obligation to pay for the services provided by Buyer under the Terminated Contract after Closing and until the Terminated Contract is terminated. The Buyer shall provide the Seller and Members with written notice of each claim for indemnification under this Section 1.7 and the Seller shall remit to Buyer the indemnification amount with fifteen (15) days of the date of such notice. Buyer and Seller shall cooperate and shall take all reasonable measures which the Buyer and Seller deems necessary and appropriate to collect all amounts due under the applicable Terminated Contracts including any negotiations and litigation, if applicable. The Buyer and the Seller shall share all costs including legal fees incurred in connection with the collection of the amounts due and shall share equally in all recoveries.

1.8     Transfer of Title.  Title to the Purchased Assets shall transfer to Buyer simultaneously with the Closing.

## 2.     PURCHASE PRICE.

2.1     The Purchase Price.  The consideration for the Purchased Assets (the "Purchase Price") shall be as follows:

(i)     Amount at Closing.  Eight Hundred Forty-Nine Thousand Sixty-One Dollars and 24/100 ($849,061.24) (the "Closing Payment"). The Closing Payment shall be payable by Buyer to Seller in cash, cash equivalents or by wire transfer of immediately available funds at Closing. Seller and each of the Members hereby consents and agrees that (a) the Closing Payment shall be sent to the Seller's counsel, Moran Kidd Lyons Johnson & Berkson, P.A.("Seller's Counsel"), for deposit in Seller's Counsel's client trust account as identified in Schedule 2.1(i) and (b) payment made by Buyer as set forth herein shall constitute full payment of the Closing Payment regardless of how the Seller and the Members elect to further distribute or allocate the Closing Payment and without liability to Buyer with respect to any action or omission by Seller's counsel with respect to the amounts deposited with it.

(ii)     Post Closing Payments Conditioned Upon Receipt of Consent to Assignment of Assumed Contracts.  The Buyer shall pay to the Seller additional payments on account of the Purchase Price in an aggregate amount not to exceed One Million Two Hundred Thousand Nine Hundred Thirty-Eight Dollars and 76/100 ($1,200,938.76) at such times as: (i) the Seller's clients listed on Schedule 2.1(ii) execute and deliver to Buyer a Consent to Assignment of Contract in the form attached hereto as _____ or, (ii) in the case where consent is not required as set forth in Schedule 2.1(ii), at such time when Seller delivers the Notice of Assignment in the form attached hereto as Appendix Four. The amount of the additional purchase price payable upon the execution and delivery of each Consent to Assignment of Contract or the Notice

of Assignment, as applicable, is set forth in Column 4 of Schedule 2.1(ii) and shall be payable within five (5) days of the date Buyer receives the assignment or the notice is sent, as applicable. No additional payments shall be paid with respect to any consent received after the expiration of three (3) months from the date of Closing.

(iii)     Earnout.   Subject to Section 6.11 and the set-offs permitted by this Agreement, as additional consideration for the purchase of the Purchased Assets, Buyer shall pay to Seller a payment (except with respect to the TRICARE contract as hereinafter provided) equal to thirty-six cents ($ .36) per Member per year for each net new Member covered by or under each Health Care Plan, Third Party Administrator, Employer or other client for which the Buyer or Buyer's parent, subsidiary, or other affiliated entity and their successors and assigns, provides case management, utilization management, disease management, health risk appraisal, self management tools, wellness or any other services utilizing the Software (the "Earnout") during the Earnout Period. The Earnout Period shall commence on the date of Closing and shall end on the third (3rd) anniversary of the date of Closing. The Earnout shall be paid annually within sixty (60) days after the expiration of the first (1st), second (2nd) and third (3rd) years of the Earnout Period by Buyer to Seller in cash, cash equivalents or by wire transfer of immediately available funds.     The Health Plans, Third Party Administrators, Employers and other entities listed on Schedule 2.1.2.20 ("Assigned Contracts") shall be excluded from the computation of the Earnout. If the Buyer is able to utilize the Software in the performance of its contract with TRICARE the Buyer will pay the Seller a fixed fee in the amount of One Hundred Thousand ($100,000) Dollars on April 1, 2011 and if TRICARE renews the contract for the second option year, the sum of Seventy-Five Thousand ($75,000) Dollars on April 1, 2012.   The Buyer (and its successors and assigns) shall use all reasonable efforts to market and sell utilization management, case management, disease management or wellness services utilizing the Software to new clients and existing clients of Buyer (and the Buyer's parent, subsidiary and affiliate entities or their successors or assigns). Notwithstanding the foregoing, the Purchaser shall continue to offer and provide utilization management, case management and disease management services utilizing the software which it licenses from Med Decision Inc. and will transition to the Med Manager Software Supported Services only with the consent of the client. A list of Buyer's client's currently utilizing the software licensed from Med Decision Inc. and the contract renewal date for each such client is attached hereto as Schedule 2.1(iii).

(iv)     Instructions for Payment of Earnout Amounts. The Seller and each Member consent and agree that the following terms apply with respect to the payment of each Annual Earnout Payments:

(a)     Until such time as Buyer or its successor to this Agreement receives a written notice executed by Seller and each Member directing payment otherwise (the "Earnout Payment Instruction Notice"); each Annual Earnout Payment shall be sent to the Seller's Counsel, for deposit in Seller's Counsel's client trust account as identified in Schedule 2.1(iv).

-7-

(b)     If and when Buyer or its successor receives an Earnout Payment Instruction Notice, Buyer or its successor shall make payment of the Annual Earnout Payments after the date of receipt by Buyer of the notice, to the payees and accounts expressly stated in the written notice (provided that the payees must be one or more of the Members or, if a Member is deceased, an heir of the deceased Member, and not creditors or other third parties).

(c)     In the event that at any time during the Earnout Period Seller shall no longer be in existence, the Members hereby consent and agree that an Earnout Payment Instruction Notice shall be sufficient if it is only executed by the three Members or their respective heirs or legal representatives, provided that the Member or heir or legal representative certifies in the notice to the fact that the Seller is no longer in existence.

(d)     Each of Seller and the Members covenants and agrees that Buyer shall not be responsible or liable to Seller or any Member or their spouses, heirs, assigns or legal representatives with respect to any disputes between or among Seller and any Members regarding their respective rights to or shares of the Earnout or for making payments of the Earnout in accordance with the instructions provided pursuant to this Agreement, and that Buyer or its successor shall not be required to validate the signatures of the Seller or the Members (or their heirs or legal representatives) in any Earnout Payment Instruction Notice and shall be able to rely on the information contained on the face of such notice.

(e)     In the event Seller and/or one or more Members dispute an Earnout Payment Instruction Notice provided to Buyer or its successor, Buyer shall have fulfilled its Earnout payment obligations by depositing the Earnout amounts then due with Seller's Counsel or in a bank escrow account until all the Seller and all the Members send an executed joint Earnout Payment Instruction Notice or provide a final order from a court or arbitration panel directing the payment and disposition of the funds.

(f)     Seller and each Member consents and agrees that payment made by Buyer or its successor as set forth in this Section shall constitute full payment of the Earnout amounts regardless of how the Seller and the Members elect to further distribute or allocate the payments and without liability to Buyer or its successor with respect to any action or omission by Seller's Counsel with respect to the amounts deposited with it.

2.2     Allocation of Purchase Price.  Buyer and Seller agree to allocate the Purchase Price among the Purchased Assets as set forth on Schedule 2.2. The parties shall (a) prepare each report relating to the federal, state, local and other tax consequences of the purchase and sale contemplated hereby in a manner consistent with

such allocation schedule and (b) take no position in any tax filing, return, proceeding, audit or otherwise that is inconsistent with such allocation.

2.3    Taxes and Fees.    All sales taxes, transfer taxes or recordation and filing fees, if any, which arise as a result of the conveyance of the Purchased Assets by Seller to Buyer hereunder shall be borne by Seller.

2.4    Seller's Audit Rights.    Seller shall have the right, at Seller's expense, to have an audit of Buyer's relevant books and records conducted by an independent certified public accounting firm for the purpose of determining that the amounts owed to Seller pursuant to Sections 2.1(ii) and (iii) have been correctly calculated and paid by Buyer. The audit may be conducted not more than once in each calendar year and may review information for the previous payment period. The auditor shall be bound to a confidentiality and non-disclosure agreement reasonably satisfactory to Seller and Buyer. The audit shall be conducted during Buyer's regular business hours at the location where the books and records are routinely kept. Information learned from the audit may only be used to ascertain compliance with the payment obligations hereunder and may not be disclosed or used for the benefit of any other person or entity. To the extent that confidentiality provisions owed to customers or other third parties prevent the disclosure of relevant contracts or other information requested as part of the audit, Buyer will provide such information and documentation as it may reasonably provide without breaching such confidentiality obligations. If additional information or documentation is needed, Buyer will make a reasonable and diligent effort to obtain the consent of the third party to the provision of the information or documentation In the event that Buyer is unable to obtain such consent, the parties shall cooperate with each other and the auditors to explore all reasonable alternatives to provide the auditors the information necessary to perform the audit contemplated by this Section 2.4. Under no circumstances will Buyer be required to disclose protected health information or other personally identifiable information of third parties in connection with an audit.

## 3.    REPRESENTATIONS   AND   WARRANTIES   OF   THE SELLER AND THE MEMBERS.

3.1    Seller hereby represents and warrants to Buyer that:

3.1.1    Organization.    Seller is a limited liability company duly organized and validly existing in the jurisdiction of its formation. Seller is duly qualified to do business and is in good standing under the Laws of each state or other jurisdiction in which either the ownership or use of the properties owned by it, or the nature of the activities conducted by it, requires such qualification. Seller has all the requisite power and authority to enter into and comply with its obligations under this Agreement and to convey the Purchased Assets to Buyer pursuant to this Agreement.

3.1.2    Authorization: Enforceability.    The execution, delivery and performance of this Agreement and all of the documents and instruments required hereby

by Seller are within the power of Seller and have been duly authorized by all necessary action of Seller and the Members. This Agreement is, and the other documents and instruments required hereby will be, when executed and delivered by Seller, the valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except to the extent that the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws of general application affecting creditors' rights generally and the application of general principles of equity. Seller has all requisite power and authority to own or lease and operate its properties and assets and to carry on the Business as it is now being conducted.

3.1.3   No Violation or Conflict. Except as set forth on Schedule 3.1.3, (i) the execution, delivery and performance of this Agreement by Seller and, to Seller's best knowledge, by each Member does not and will not conflict with or violate or result in a breach of the terms, conditions or provisions of any agreement, document or instrument to which Seller or a Member is a party or by which Seller or a Member is bound and (ii) no consent of, registration, declaration or filing with, or notice to, any third party, court, or Governmental Entity is required to be made or obtained by or with respect to Seller or the Members in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby, including the assignment of the Assigned Contracts.

3.1.4   Capitalization. The Members are the sole owners of any membership interests, equity, warrant, or other ownership interests in Seller and there have not been any other members, owners, equity holders, or warrant holders at any time since the creation of Seller. There are no outstanding or authorized rights, options, warrants, convertible securities, subscription rights, conversion rights, exchange rights, rights of first refusal, or other agreements or commitments of any kind that could require Seller to issue or sell any membership, equity or ownership interest to any third party or that a third party be offered the right or opportunity to purchase any of the Purchased Assets prior to the Closing.

3.1.5   Title to and Condition of Purchased Assets. Seller owns good, valid and marketable title to all of the Purchased Assets, free and clear of any and all Liens and conveys the Purchased Assets to Buyer free and clear of any and all Liens. The Furniture, Furnishings and Equipment shall be sold "as is" "where is".

3.1.6   Financial Information. The current and historical financial information set forth in Schedule 3.1.6 (the "Financial Information") concerning the Business provided by Seller to Buyer in connection with the transactions contemplated herein, is accurate and complete in all material respects, and fairly presents the financial position of the Business as of the dates reflected therein and the results of operations for the periods reflected therein.

3.1.7   Litigation. Except as set forth on Schedule 3.1.7, there is no suit, action, investigation or Proceeding pending, or, to the best knowledge of Seller, threatened against or affecting Seller or any Member that relates to or involves the

-10-

Business or any of the Purchased Assets, or which, if adversely decided, would adversely impact Buyer's ability to own or use the Purchased Assets after the Closing.

3.1.8 <u>Approvals</u>. Except as set forth on Schedule 3.1.8, neither Seller nor any Member is required to submit any notice, report, or other filing, and no consent, approval, or authorizations are required by any person, entity or Governmental Entity in connection with its execution or delivery of this Agreement or the consummation of the transactions contemplated hereby.

3.1.9 <u>Taxes</u>. There are no Liens for Taxes upon the Purchased Asset or properties of the Business or Seller. No federal, state, local or foreign audits, review, or other actions ("<u>Audits</u>") exist with regard to any Taxes or Tax Returns of Seller, and Seller has not received any notice of such an Audit. Seller:

(a)    has duly and timely filed (or there has been filed on its behalf) with the appropriate Governmental Entities all Tax Returns required to be filed by it, and all such Tax Returns are complete and accurate;

(b)    has timely paid all Taxes due from Seller (whether or not set forth on any Tax Return);

(c)    has complied in all material respects with all applicable Tax Laws relating to the payment and withholding of Taxes (including withholding of Taxes pursuant to Sections 1441, 1442, 3402 and 4999 of the Code and employment withholding Taxes) and has, within the time and manner prescribed by law, withheld and paid over to the proper Government Entity all amounts required to be withheld and paid over under all applicable Tax Laws;

(d)    except as described in Schedule 3.1.9(d), has not requested any extension of time within which to file any Tax Return in respect of any taxable year which has not since been filed, and no outstanding waivers or comparable consents regarding the application of the statute of limitations with respect to any Taxes or Tax Returns has been given by or on behalf of Seller;

(e)     is not a party to or bound by, and does not have any obligation under, any Tax sharing agreement, Tax indemnification agreement or similar contract or arrangement;   .

(f)     has fully paid all Tax deficiencies which have been claimed, proposed or asserted against Seller;

(g)     except as described in Schedule 3.1.9(g), has not incurred any Liability for Taxes other than in the ordinary course since December 31, 2007; and

(h)     is not, nor has it at any time in the last five (5) years been, a "United States real property holding corporation" within the meaning of Section 897 of the Code.

3.1.10  Employees.  Schedule 3.1.10 contains a complete and accurate list of all current employees of Seller.  Except as set forth on Schedule 3.1.10, Seller is not a party to any employment, agency or commission agreement with any of its employees, nor is it subject to any collective bargaining agreement, and there are no claims or suits arising out of the employment of Seller's employees pending or, to the knowledge of Seller, threatened in writing against Seller or a Member.  Except as set forth on Schedule 3.1.10, Seller has not established or participated in, nor does it presently have in effect, any employee welfare, pension or profit-sharing plan, as defined in the Employee Retirement Income Security Act of 1984, as amended ("ERISA").  All payments required to be made to any such plans by Seller have been paid in full and no unfunded Liability exists with respect to any such plans as of the Closing.

3.1.11  Contracts.  Except as set forth on Schedule 3.1.11, Seller is not in default under any of the Assigned Contracts, nor has any event occurred, which, through the passage of time or the giving of notice, or both, would constitute a default under any of the Assigned Contracts, or cause the acceleration of any obligation of Seller or result in the creation of any Lien, charge or encumbrance upon any of the Purchased Assets.  Each Assigned Contract is valid, binding and in full force and effect and enforceable in accordance with its terms.  Except with respect to fees payable by customers in the ordinary course, there are no payments, royalties, fees or other amounts due to or from Seller or any Member or to or from the other contracting parties thereunder.  Except as described in Schedule 3.1.11, there is no dispute known to Seller regarding the scope of such contract, or performance or obligations under such contract.  Seller has provided to Buyer a full and complete copy (including all amendments, side agreements and waivers) of the Assigned Contracts.  The Assigned Contracts are the only material contracts or agreements of Seller that are used in connection with the Business or that relate to or impact the use by Seller of any of the Purchased Assets.  No contracts that are necessary to or useful in connection with the conduct of the Business prior to Closing or the use of the Purchased Assets after the Closing is held in the name of any Member.  Except for the Assigned Contracts, there are no other material contracts that

relate to or impact (including in the event of a breach) the use by Seller or by Buyer of any of the Purchased Assets, including contracts or agreements of the following type:

(a)     consulting, development, procurement, collaboration, trial, source code escrow, customer, interface, and confidentiality agreements;

(b)     licenses, licensing arrangements, non-competes, covenants not to sue, and other contracts providing for or limiting in any way, in whole or in part, the transfer, use, modification, manufacturing, sale, distribution, marketing, or export of any of the Purchased Assets or Intellectual Property Rights;

(c)     maintenance and support agreements;

(d)     outstanding orders and other contracts for the purchase, supply or sale of materials, supplies, products or services;

(e)     any contract wherein or whereby Seller has agreed to, or assumed, any obligation or duty to warrant, indemnify, reimburse, hold harmless, guaranty or otherwise assume or incur any obligation or Liability, or provide a right of rescission or covenant not to sue or assert rights, with respect to the infringement or misappropriation by Seller or any other person or entity of the Intellectual Property Rights of any person or entity that relates to any of the Purchased Assets;

(f)     joint venture, partnership and similar contracts involving a sharing of profits or expenses; and

(g)     asset purchase agreements and other acquisition or divestiture agreements.

3.1.12  Insurance.  Schedule 3.1.12 attached hereto constitutes a complete and accurate schedule of all insurance policies held by Seller with respect to the Business which are now in full force and effect, showing the identities of the insured party, the name of the insurer, the nature and amount of coverage, and all pending claims. All insurance policies maintained by Seller are current and in good standing, and no premiums are past due.  Seller has not been advised of the cancellation or intended cancellation of any insurance policy or of the intention of any insurer or underwriter to refuse to renew any of such insurance policies at premiums approximately the same as the premiums currently paid by Seller.

3.1.13  Absence of Undisclosed Liabilities.  Except set forth on Schedule 3.1.13, there is no claim, obligation, Liability or commitment, whether absolute, accrued, contingent or otherwise and whether due or to become due, arising out of otherwise directly or indirectly related to the Purchased Assets or the Business.

-13-

3.1.14  Compliance with Laws; Governmental Approvals.  Seller is in compliance with all Laws, regulations, orders, ordinances, codes, injunctions and decrees applicable to the Purchased Assets or the Business.  Seller has conducted the Business in compliance in all respects with all federal, state and local Laws and orders (governmental or judicial), judgments, show cause demands or decrees outstanding which impact or regulate the ownership, possession, licensing, and use of the Purchased Assets. All consents, approvals, or authorizations required by any Governmental Entity necessary for the conduct of the Business as conducted on and before the Closing have been duly obtained and are in full force and effect and Seller is in compliance with each of such consents, approvals or authorizations held by it.

3.1.15  Solvency.  Seller is, after giving effect to the transactions contemplated hereby, solvent, able to pays its debts as they become due in the usual course of business, will have assets having a value, both at fair valuation and at present fair saleable value, greater than the amount required to pay its debts as they become due in the usual course of business, and will not be rendered insolvent by the execution, delivery or performance of this Agreement or by the completion of the transactions contemplated hereunder.  To the best knowledge of Seller, no Person is contemplating the filing of any state or federal bankruptcy or insolvency petition against Seller.  Seller is not currently the subject of any bankruptcy or similar proceeding under any state or federal law and none of its property is under the jurisdiction of any bankruptcy court or other court having similar jurisdiction.

3.1.16  Government Contracts.  There are no contracts, or other arrangements or undertakings between Seller and any Governmental Entity granting rights to or reserving rights in any of the Purchased Assets to or by such Governmental Entity.  No part of the Software has been developed or enhanced under a contract with a Governmental Entity or with funds provided by a Governmental Entity.

3.1.17  Intellectual Property

(a)    Seller is the sole and exclusive owner of all Intellectual Property Rights in and to the Purchased Assets, free and clear of all Liens and claims from third parties.

(b)    Seller has the right to assign, transfer and convey to Buyer the IP Rights.

(c)    There are no registered copyrights, pending patent applications, issued patents, registered trademarks or pending trademark registration applications anywhere, in the name of Seller or any Member or which is otherwise beneficially owned by Seller or any Member that covers any of the Purchased Assets (other than the Equipment) or the use thereof.

-14-

(d)      The Purchased Assets do not infringe the copyrights or patents, misappropriate the trade secrets or otherwise violate any other Intellectual Property Rights of any third party, and the assignment and sale of the Purchased Assets to Buyer as of the Closing and the use by Buyer thereafter in the manner in which they have been used as of the Closing will not cause Buyer to infringe, misappropriate, or otherwise violate the Intellectual Property of any third party.

(e)      There are no proceedings or actions pending as of the Closing before the United States Patent and Trademark Office, the United States Copyright Office, the Federal Trade Commission, or equivalent authorities anywhere in the world related to any of the Purchased Assets or the Intellectual Property Rights therein.

(f)      Seller is not aware of any claim of ownership or inventorship by any third party of any aspect or component of the Purchased Assets or the Intellectual Property Rights (other than with respect to Equipment). The Members, Danny Wardey, Jerome Ridenauer, Violetta Haag and Robert Rideout are the only entities and individuals, whether employees or contractors of Seller, who have been involved in the development or creation of the Purchased Assets (other than the Furniture, Furnishings, Equipment). The individuals identified above will execute and deliver to Buyer on or before Closing, a confirmation assignment, in the form attached hereto as ███████████, have no ownership right, title or interest in or to the Software, IP rights, Inventions or any other work product created by them while working for the Seller.

(g)      To the extent that any of the Purchased Assets (other than the Equipment) has been developed or created by any person or entity, other than Seller, Seller has the unrestricted right to grant and convey the rights and title granted to Buyer under this Agreement to all such Purchased Assets by operation of law or by valid assignment of any such rights.      Seller has secured valid written assignments of Intellectual Property Rights from all third parties and consultants who contributed to the creation or development of any aspect of the Purchased Assets (other than the Equipment).

(h)      Except for the rights to use granted in the Assigned Contracts, Seller or any Member has not transferred ownership of or granted any license or other right to use or authorized the retention of any rights to use or agreed to any limitation in the use of any Purchased Assets to or for the benefit of any other person or entity.

(i)      To the knowledge of Seller, no person or entity is infringing or misappropriating any Intellectual Property Rights associated with the Purchased Assets (other than the Equipment).

(j)      Seller has taken commercially reasonable steps to protect its rights in its confidential information and trade secrets relating to the Purchased Assets.

-15-

Seller is not disclosing or assigning to Buyer any proprietary or confidential information of a third party that it does not have the right to disclose or assign.

(k)     Neither this Agreement nor any transactions to be accomplished pursuant to this Agreement will result in Buyer granting any rights or licenses with respect to the IP Rights to any person or entity pursuant to any contract to which Seller is a party, except for such use rights expressly granted in the Assigned Contracts.

(l)     Except as set forth in Schedule 3.1.17(l), the Software and the Code Base do not use or include any freeware or open source software.

3.1.18  HIPAA.  Schedule 3.1.18 identifies all the business associate agreements (BAAs) and other similar agreements to which Seller is a party or to which it is bound which pertain to the collection, storage, analysis, review or transmission of protected health information ("PHI") as defined in the Health Insurance Portability and Accountability Act and enabling regulations ("HIPAA"). Seller is in full compliance with its obligations under such agreements, under HIPAA and under applicable privacy policies with respect to PHI that is has collected, stored, analyzed, reviewed or transmitted, and there have not been any data breaches with respect to any such PHI.  Seller has all necessary rights and consents to transfer the PHI in its possession to Buyer.  There are no claims by any third party against Seller or any Member relating to the PHI referenced above and to Seller's knowledge there is not a meritorious basis for any third to make such a claim.

3.1.19  Accounts Receivable.  The Assigned Accounts Receivable represent valid obligations arising from sales actually made or services actually performed in the ordinary course of business.  The Assigned Accounts Receivable are current and collectible in the ordinary course of business.

3.1.20  Bulk Sales.  There are no bulk sales or bulk transfer Laws applicable to the sale and transfer of the Purchased Assets.

3.1.21  URAC Accreditations.  Schedule 3.1.21 identifies the URAC Accreditations which have been assigned to the Seller.  Seller's representations contained in its applications for accreditation were true and correct when made and are true and correct as of the date of this Agreement.  Seller shall use its best effort to transfer Seller's certifications of accreditation to the Purchaser or its parent, Keystone Peer Review Organization, Inc.     Seller makes no representations that the URAC Accreditations are assignable or transferable to Buyer. Where applicable, the Consent to Assignment of Contract attached hereto as ████████████ shall contain a waiver of any URAC Accreditation requirement in any Assigned Contract for a period of no less than nine (9) months after the date of Closing.

3.2     By the Members. Each of the Members represents and warrants to Buyer that: (i) the member has all necessary rights and authority to enter into,

-16-

execute and deliver this Agreement and perform the obligations hereunder which pertain to such Member and the execution and delivery of this Agreement by such Member does not conflict with any agreement to which the Member is bound; (ii) no spouse, heir and personal representative of, or other individual related to, such Member has any right, title or interest in or to any of the Purchased Assets and the consent, authorization or approval of any such other individual is not required for the transactions contemplated hereunder to be effective and valid or for the Member to execute, deliver and perform under this Agreement; and (iii) the Member does not own now or have a right to own at any time hereinafter any rights or title in or to any of the Purchased Assets. Members represent and warrant that all the representations and warranties of the Seller are true and correct, and that Members will cause the Seller to comply with its covenants and other obligations hereunder.

        3.3   Full Disclosure. Seller and each of the Members represents and warrants to Buyer that no representation or warranty by such party contained in this Agreement or any information in any schedule or instrument, furnished or to be furnished by Seller or such Member pursuant hereto, contains any untrue statement of a material fact or admits or fails to state any material fact necessary in order to make the statements contained therein not misleading.

### 4.    REPRESENTATIONS AND WARRANTIES OF THE BUYER.

        Buyer represents and warrants to Seller that:

        4.1   Organization. Buyer is a corporation duly organized and validly existing and in good standing in the jurisdiction of its formation. Buyer has all the requisite power and authority to enter into and comply with its obligations under this Agreement.

        4.2   Authorization; Enforceability. The execution, delivery and performance of this Agreement and all of the documents and instruments required hereby by Buyer are within the corporate power of Buyer and have been duly authorized by all necessary action of Buyer. This Agreement is and the other documents and instruments required hereby will be, when executed and delivered by Buyer, valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except to the extent that the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws of general application affecting creditors' rights generally and the application of general principles of equity.

        4.3   No Violation or Conflict. The execution, delivery and performance of this Agreement by Buyer does not and will not conflict with or violate the articles of organization or operating agreement of Buyer or conflict with, violate or result in a breach of the terms, conditions or provisions of, any agreement, document or instrument to which Buyer is a party or by which it is bound.

-17-

4.4     Full Disclosure.  No representation or warranty by Buyer contained in this Agreement or any information in any schedule, instrument, or document furnished or to be furnished by Buyer pursuant hereto, contains any untrue statement of a material fact or admits or fails to state any material fact necessary in order to make the statements contained therein not misleading.

## 5.     CLOSING; CLOSING DELIVERABLES

5.1     Closing.    The purchase and sale provided for in this Agreement (the "Closing") will take place at the office of Buyer's counsel.  Moran Kidd Lyons Johnson & Berkson, P.A., 111 North Orange Avenue, Suite 1200, Orlando, FL, commencing at 9:00 a.m. local time on or before July 1, 2010 (the "Closing") or on such other date as the parties may mutually agree.

5.2     Seller Deliveries at Closing.    At the Closing and as a condition to the consummation of the transactions contemplated herein, Seller and Members shall deliver, or cause to be delivered, the following to Buyer:

(i)     A Bill of Sale signed by Seller in form and substance reasonably acceptable to Buyer;

(ii)     An Assignment and Assumption agreement for the Assigned Contracts (the "Assignment and Assumption Agreement") signed by Seller in form and substance reasonably acceptable to Buyer and Seller;

(iii)     Resolutions of Seller's members and · managers, approving the execution and delivery of this Agreement, all related documents and agreements, and the transactions contemplated thereby, certified by an officer or manager of Seller, in form and substance reasonably acceptable to Buyer;

(iv)     A copy of each consent, registration, declaration, filing or notice set forth on Schedule 3.18 , in form and substance reasonably acceptable to Buyer, including the consents to assign the Assigned Contracts

(v)     The Purchased Assets;

(vi)     Documentation required by the relevant domain name registrar to transfer to Buyer the URLs and domain names that are part of the Web Artifacts;

(vii)     Payoff letters from each of the creditors of Seller who have a Lien on the Purchased Assets ("Seller Payee"), in form and substance reasonably acceptable to Buyer, setting forth the amount owed by Seller to each Seller Payee and agreeing that upon receipt of the amounts owed to it, such Seller Payee will immediately release and forever discharge any and all Liens it may have had in or to any of the

Purchased Assets and will take such action as to promptly cause any and all filings or documentation to reflect such release and discharge of any and all Liens, including without limitation filing UCC-3 termination statements within five (5) business days of receipt of the amounts owed to such Seller Payee;

(viii)   A good standing certificate issued by the Secretary of State of the State of Florida with respect to Seller issued within 5 business days prior to the Closing;

(ix)   A quitclaim assignment of all IP Rights to the Purchased Assets signed by each Member in form and substance reasonably acceptable to Buyer;

(x)   The Employment Agreements set forth in ▮▮▮▮▮ ▮▮▮ executed by Cabrera and Noecker respectively.

(xi)   All such other documents and instruments as may be reasonably requested by Buyer to effectively convey title to the Purchased Assets to it and otherwise consummate the transactions contemplated hereby.

5.3   <u>Buyer Deliveries at Closing</u>. Buyer shall deliver to Seller at Closing:

(i)   the Closing Payment;

(ii)   the Assignment and Assumption Agreement signed by Buyer;

(iii)   The Employment Agreements set forth in ▮▮▮▮▮▮▮ executed by Cabrera and Noecker respectively; and

(iv)   Resolutions of Buyer's Board of Directors/manager approving the execution and delivery of this Agreement, all related documents and agreements, and the transactions contemplated thereby, certified by an officer or manager of Buyer, in form reasonably acceptable to Seller.

## 6.   **ADDITIONAL COVENANTS OF THE PARTIES.**

6.1   <u>Further Assurances</u>. From and after the Closing, each of the parties agrees, at the other party's request and without further consideration, to execute and deliver to such party, all such additional or confirmatory instruments, reports and acknowledgments as may be reasonably requested by the other party, and to take any and all such other actions as the other party may reasonably request, to evidence or perfect the sale, assignment, transfer and conveyance to Buyer of the Purchased Assets, and to vest title thereto in Buyer, and to otherwise fulfill its obligations hereunder.

-19-