6.2   Confidentiality.   Seller and the Members hereby covenant and agree to keep all non-public information relating to the transactions contemplated hereby or the Purchased Assets as the confidential and proprietary information of Buyer, and will exercise reasonable and diligent efforts to safeguard it from disclosure to third parties, and will not use such information for any purpose after the Closing without prior written consent of Buyer except as necessary to provide services to Buyer.

6.3   Non-Competition and Non-Solicitation.

(i) Seller and each Member hereby covenant and agree as follows: For a period commencing with the Closing and ending three (3) years thereafter, neither Seller nor a Member shall for any reason whatsoever, directly or indirectly, for itself, himself/herself or on behalf of or in conjunction with any other Person (a) own, finance, control or engage, as a shareholder, member, owner, partner, joint venturer or director (meaning a member of the board of directors of a corporation as opposed to, for example, an officer position as Medical Director) in any Competing Business; provided, however, that Seller and each Member may purchase or otherwise acquire up to (but not more than) five percent (5%) of any class of the securities of any company listed on any national or regional securities exchange; (b) solicit any employee or contractor of Buyer or Buyer affiliates who performs works relating to the products and services that relate to the Software to leave the employment or engagement of Buyer of its affiliates or engage with respect to a Competing Business any person who was an employee or contractor of Buyer or its affiliates within the twelve (12) months prior to the engagement; or (c) solicit any customer that is a party to one of the Assigned Contracts who has entered into a Contract with Buyer or any of its affiliates after Closing to terminate its relationship with the Buyer or Buyer affiliates. Nothing herein shall be construed to prohibit any Member from becoming an employee, independent contractor, consultant or advisor for a Competing Business except as otherwise prohibited by the Employment Agreement entered into by such Member as contemplated by this Agreement.

(ii)   Because of the difficulty of measuring economic losses to Buyer as a result of a breach of the foregoing covenants by Seller or a Member and of the immediate and irreparable damage that could be caused to Buyer for which it would have no other adequate remedy, the parties agree that the covenants in this Section 6.3 may be enforced by Buyer in the event of breach by injunctions and restraining orders and other equitable remedies (in addition to, but not in lieu of, any other available remedies).

(iii)   In the event Seller or any Member breach any of the covenants set forth in Section 6.3(i), Buyer shall be forever released and discharged for its obligation to make any further payments pursuant to the Earnout.

(iv)   The covenants in this Section 6.3 are severable and separate, and the unenforceability of any specific covenant shall not affect the provisions of or any other covenant of this Agreement.

(v)     The parties hereby agree that all covenants contained in this Section 6.3 are fair, reasonable, valid and are necessary to protect the IP Rights and the confidential information and trade secrets related to the Business and to protect such rights for the benefit of the Buyer and its successors.

6.4     Accounts Receivable.  To the extent Seller or any Member collects   or receives any funds in full or partial payment of any Assigned Accounts Receivable, Seller or such Member covenants and agrees to  promptly remit to Buyer the full amounts collected or received, without set-offs, along with any communication or invoice relating thereto.  To the extent Buyer collects or receives any funds in full or partial payment of any Retained Accounts Receivable, Buyer covenants and agrees to promptly remit to Seller the full amounts collected or received, without set-offs, along with any communication or invoice relating thereto.

6.5     Amounts Collected by Seller.  (i) As of the Closing, to the extent Seller has collected money for services or goods that are to be performed or provided, after the Closing, Seller shall remit such amounts (including those set forth on Schedule 6.5) to Buyer within two (2) business days of the Closing; and (ii) after the Closing, to the extent Seller collects money for services or goods that are to be performed or provided, in whole or in part, after the Closing, Seller shall promptly remit such amounts to Buyer within two (2) business days of receipt.

6.6     Services or Goods Provided by Third Parties.  To the extent that third parties have provided services or goods to Seller or to customers or other third parties on behalf of Seller (including coaches, developers, IT consultants,  and the like) prior to the Closing and Seller has not paid for such services or goods at or prior to the Closing, Seller shall, subject to the mutual agreement of the parties, either (i) promptly pay such third parties in full for such services or goods and provide to Buyer evidence thereof or (ii) promptly pay Buyer an amount equal to such amount owed to the third parties and Buyer shall have the obligation to pay such third parties to the extent of the amounts provided by Seller and to provide to Seller evidence thereof; provided that any such amounts shall be subject to the proration as set forth in Section 6.7 below.

6.7     Prorated Taxes; Other Expenses.  At Closing, all personal property taxes assessed against or prepaid with respect to the Purchased Assets shall be pro-rated as of Closing, based upon the applicable tax rate of the period for which assessed or prepaid, or, if the Closing shall occur before the tax rate is fixed, the apportionment of such taxes shall be on the basis of taxes paid for the preceding year, subject to adjustment when the rate is established.  Seller shall be responsible for that portion of the pro-rated taxes accrued for the period ending as of the Closing and Buyer shall be responsible for that portion of the pro-rated taxes attributable to the period beginning after the Closing.  In addition, any prepaid expenses or similar obligations that have been prepaid by Seller and any payables due and owing to third parties shall be pro-rated as of Closing.  To the extent any such prepaid expenses or payables cannot be determined at Closing, the parties agree to reconcile all such pro rations due and owing between the parties within 30 days of Closing.

6.8     Accounts Receivable. After the Closing, Seller. shall use reasonable best efforts to assist Buyer in documenting and collecting the Assigned Accounts Receivable and Buyer shall use reasonable efforts to assist Seller in documenting and collecting the accounts receivable retained by Seller..

6.9     Covenant Not to Assert Rights. Seller and each Member hereby covenants to Buyer that it/he will not, directly or through others, assert against Buyer, Buyer affiliates, and their respective successors and assigns, customers and licensees, any patent, trade secrets or copyright rights of Seller or the Member that exist as of the date hereof (including rights to inventions conceived or first reduced to practice as of the date hereof) which are necessary for Buyer to reduce to use, modify, make or have made, import, export, distribute, sell, offer for sale, market, distribute or create derivative works of the Purchased Assets or for their customers and licensee to use such Purchased Assets, as they may be modified or enhanced hereinafter.

6.10    Name Change. Within thirty (30) days of the Closing, Seller will cause its corporate name to change to a name that is not confusing similar to "Preferred Physicians Healthcare Alliance, L.C." and will provide written documentation to Buyer of such change.

## 7.     INDEMNIFICATION.

7.1     Survival of Representations and Warranties. All representations and warranties contained in this Agreement shall survive for a period of two (2) years after the Closing unless waived in writing by the party for whose benefit such representations and warranties have been given, except for those contained in Sections 3.1.2, and 4.2, which shall survive for the applicable statute of limitations.

7.2     Indemnification.

7.2.1   Indemnification by Seller and Members. Subject to the limitations and exclusions set forth in Section 7.5 of this Agreement, each of Seller and Members hereby agrees, jointly and severally, to indemnify and hold harmless Buyer and Buyer affiliates and their respective employees, members, representatives, agents, directors, officers or assigns, from and against any and all damage, loss, Liability, obligations, deficiency, claim, cost and expense (including reasonable attorneys' fees) resulting from:

(i)     any and all obligations and liabilities of any kind or nature, whether accrued, absolute, contingent or otherwise, in any way relating to or arising out of (a) the conduct or operation of the Business prior to the Closing, (b) the development, ownership, licensing, distribution or use of any of the Purchased Assets prior to the Closing, or (c) the performance or failure to perform by Seller under the terms of any of the Assigned Contracts prior to the Closing;

(ii)     any breach of any representation or warranty of Seller or any Member contained in this Agreement or in any schedule, exhibit, instrument or agreement delivered pursuant hereto or in connection with the transactions contemplated hereby;

(iii)     any breach, omission, nonfulfillment or misrepresentation of any covenant or agreement of Seller or any Member in this Agreement or any schedule, exhibit, instrument or agreement delivered pursuant hereto or in connection with the transactions contemplated hereby;

(iv)     any brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding made, or alleged to have been made, by any person or entity with Seller or any Member in connection with any transactions contemplated by this Agreement; or

(v)     any and all obligations and liabilities arising out of the litigation described in Schedule 3.1.7 or any claim by Fonemed that any alleged existing contract with the Seller is binding upon or becomes the assumed liability of the Buyer.

7.2.2    Indemnification by Buyer. Buyer hereby agrees to indemnify and hold harmless Seller and any employee, representative, agent, director, officer or assignee of Seller, from and against any and all damage, loss, Liability, obligation, deficiency, claim, cost and expense (including reasonable attorneys' fees) resulting from:

(i)     any breach of any representation or warranty of Buyer contained in this Agreement or in any schedule, exhibit, instrument or agreement delivered pursuant hereto or in connection with the transactions contemplated hereby; or

(ii)     any breach, omission, nonfulfillment or misrepresentation of any covenant or agreement of Buyer in this Agreement or any schedule, exhibit, instrument or agreement delivered pursuant hereto or in connection with the transactions contemplated hereby.

(iii)     any and all obligations and liabilities of any kind or nature, whether accrued, absolute, contingent or otherwise, in any way relating to or arising out of (a) the conduct or operation of the Business subsequent to the Closing, (b) the development, ownership, licensing, distribution or use of any of the Purchased Assets subsequent to the Closing, or (c) the performance or failure to perform by Buyer under the terms of any of the Assigned Contracts subsequent to the Closing;

(iv)     any brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding made, or

alleged to have been made, by any person or entity with Seller or any Member in connection with any transactions contemplated by this Agreement.

      7.3    Right of Set-Off. Subject to the limitations (and exclusions from the limitations) set forth in Section 7.5 of this Agreement, Post Closing Payments described in Section 2.1(ii), the Earnout, the Annual Earnout Payments payable to Seller (or its designee) or to any Member or the Member's spouses, heirs, assigns or legal representatives pursuant to Section 2.1(iv) and (v) shall be available to Buyer or its successors and assigns to satisfy any obligations of Seller or Member under Section 6.5, Section 6.6 or Section 7.2.1 or a claim against another Member for violation of a representation, warranty or covenant of such Member. The rights of Buyer and its successors under this Section 7.3 shall be in addition to and not in limitation of any other rights and remedies to which Buyer or its successors are or may be entitled to under this Agreement or at law or in equity, including injunctive relief.

      7.4    Knowledge of Buyer. · The right to indemnification, reimbursement or other remedy by Buyer, its affiliates, and their respective employees, members, representatives, agents, directors, officers or assigns, based upon the representations, warranties, covenants and obligations contained herein shall not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) by Buyer, its affiliates and their respective employees, members, representative, agents, directors, officers or assigns at any time, whether before or after the execution and delivery of this Agreement or the Closing, with respect to the Purchased Assets or the accuracy or inaccuracy of or Seller's or a Member's compliance with any such representation, warranty, covenant or obligation.

      7.5    Limitations on Indemnification. (a) Any claim made by the Buyer against Seller or any of the Members with respect to any breach of a representation, warranty and/or a claim for indemnification may only be made after the aggregate of all losses, liabilities, costs, or damages, expenses, re-assessments and/or indemnity claims is equal to or greater than Twenty-Five Thousand ($25,000) Dollars (the "Basket Amount") after which the Buyer may claim the full amount of all such losses, liabilities, costs, damages, expenses, or re-assessments and/or indemnity claims, but only for such amounts in excess of the Basket Amount. Additionally, the liability of Seller and the Members to Buyer with respect to any and all breaches of representations, warranties and/or claims for indemnification shall not, in the aggregate (except for claims for which fraud by the Seller or a Member has been proven), exceed the Purchase Price. Notwithstanding the above, the Basket Amount and the cap above shall not apply to claims for indemnification resulting from a breach of the representations and warranties in Section 3.1.2 and the actions or costs required to cure such breach.

      (b) Any claim made by the Seller or a Member against Buyer or its successors or affiliates with respect to any breach of a representation, warranty and/or a claim for indemnification may only be made after the aggregate of all losses, liabilities, costs, or damages, expenses, re-assessments and/or indemnity claims is equal to or greater than the Basket Amount after which the Seller or the Member may claim the full

amount of all such losses, liabilities, costs, damages, expenses, or re-assessments and/or indemnity claims, but not only for such amounts in excess of the Basket Amount. Finally, the liability of Buyer to Seller and the Members with respect to any and all breaches of representations, warranties and/or claims for indemnification shall not, in the aggregate (except for claims for which fraud by Buyer has been proven), exceed the Purchase Price. Notwithstanding the above, the Basket Amount and the cap above shall not apply to claims for indemnification resulting from a breach of the representations and warranties in Section 4.2 and the actions or costs required to cure such breach.

8.    **MISCELLANEOUS.**

8.1    Entire Agreement: Amendment: Waiver.  This Agreement and the documents referred to or delivered pursuant to this Agreement, constitute the entire agreement between the parties pertaining to the subject matter hereof, and supersede any and all prior and contemporaneous agreements, understandings, negotiations and discussions of the parties, whether oral or written.  No amendment, supplement, modification, waiver or termination of this Agreement shall be binding unless executed in writing by all parties hereto, or in the case of a waiver, by the party for whom such benefit was intended.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any provision of this Agreement, whether or not similar, nor shall such waiver constitute a continuing waiver unless otherwise expressly provided in writing.  The parties acknowledge and agree that facsimiles or photocopies of the executed original of this Agreement shall be deemed to have the same force and effect as an executed original for all purposes.

8.2    Expenses.  Each party shall pay the fees of its own legal counsel, accountants and other advisers incurred in connection with the negotiation and preparation of this Agreement, and the consummation of the transactions contemplated by this Agreement.

8.3    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

8.4    Publicity.  Seller and Buyer will agree to the content of, and upon such agreement, may each issue, a reasonable press release announcing the consummation of the transactions contemplated herein. Each party may refer third parties to the press release and quote from the press release in connection with referencing the transactions contemplated hereby. Otherwise, without the prior written consent of Buyer, Seller or the Members will not make, and will direct its representatives not to make, directly or indirectly, any written public statement or communication with respect to the transactions contemplated by this Agreement, except as required by law or regulation or judicial mandate.

8.5    Severability.  If any provision or clause of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the

-25-

validity of the rest of the Agreement shall not be affected and the rights and obligations of the parties shall be construed and enforced as if this Agreement did not contain the particular part held to be invalid or unenforceable.

8.6     Applicable Law. This Agreement shall be governed in all respects, including as to validity, interpretation and effect, by the internal laws of theState of Florida, without giving effect to the conflicts of law rules thereof. Each party hereto irrevocably agrees that any action or proceeding with respect to this Agreement or for recognition and enforcement of any judgment in respect hereof brought by another party hereto or its successors or assigns shall be brought and determined solely by either a state court or federal court in the State of Florida and each party hereto hereby irrevocably submits with regard to any such action or proceeding for itself and in respect to its property to the exclusive jurisdiction of the aforesaid courts.

8.7     Notice. Any notice or communication given or required pursuant to this Agreement by any party to the other party shall be deemed properly given if delivered personally, sent by delivery service which provides evidence of delivery, or in writing and mailed by registered or certified mail, postage prepaid, return receipt requested to the following:

> If to Seller to:
>
> Preferred Physicians Healthcare Alliance, L.C.
> 2450 Maitland Center, Suite 203
> Maitland, FL 32751
>
> With a copy to:
>
> Gary M. Berkson, Esquire
> Moran Kidd Lyons Johnson & Berkson, P.A.
> P.O. Box 472
> 111 N. Orange Avenue, Suite 1200
> Orland, FL 32801
>
> If to Buyer to:
>
> KePro Acquisitions, Inc.
> 777 East Park Drive
> Harrisburg, PA 17111
> Attention: Joseph A. Dougher
>
> With a copy to:

James A. Ulsh, Esquire
Mette, Evans & Woodside
3401 North Front Street
P.O. Box 5950
Harrisburg, PA 17110

If to Cabrera:

Edward Cabrera, M.D.
6365 Collins Avenue #2503
Miami Beach, FL  33141

If to Noecker:

Dianna Noecker, R.N.
1261 Arlington Place
Winter Park, FL  32789

or to such other address as shall hereinafter be furnished in writing by any party hereto to
the other party hereto.

        8.8    Counterparts.  This Agreement may be executed in one or
more counterparts, each of which shall be deemed an original, and all of which together
shall constitute one agreement.

        8.9    Broker's Fees.  Buyer and Seller each represents to the
other that it has not used any broker, finder, or other agent in connection with this
transaction. Buyer and Seller each agree to indemnify the other for any claims brought
by any broker, finder, or other agent claiming to have acted on its behalf in connection
with this transaction.

        8.10    Recitals; Headings.    The Recitals appearing at the
beginning of this Agreement are hereby incorporated in this Agreement. The headings
contained in this Agreement are for purposes of convenience only and shall not affect the
meaning or interpretation of this Agreement.

        8.11    Attorneys' Fees.  In any action or proceeding between the
parties regarding this Agreement or its enforcement, the prevailing party in such action or
proceeding is entitled to collect and recover from the non-prevailing party all costs of
such action or proceeding incurred by such prevailing party, including, but not limited to,
reasonable attorney fees and costs through all levels of proceedings, including appeals.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers of the day and year first above written.

KEPRO ACQUISITIONS, INC.

By:
Name: Joseph M. Dougher
Title: CEO

PREFERRED PHYSICIANS HEALTHCARE ALLIANCE, L.C.

By:
Name: Edward Cabrera
Title: President / CEO

MEMBERS:

Edward Cabrera

Dianna Noecker

-28-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers of the day and year first above written.

**KEPRO ACQUISITIONS, INC.**

By:_____
Name: Joseph A Doughe
Title: CEO


**PREFERRED PHYSICIANS HEALTHCARE ALLIANCE, L.C.**

By:_____
Name:_____
Title:_____


**MEMBERS:**

_____
Edward Cabrera


_____
Dianna Noecker

APPENDIX ONE

DEFINITIONS

As used in this Agreement, capitalized terms not otherwise defined shall have the respective meanings ascribed to them below:

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Business" means any business that engages, in whole or in part, in the Utilization Management, Case Management, Disease Management, Health Screening, Health Risk Appraisal, Self Health Management Tools and other Wellness Programs to Health Care Plans, Third Party Administrators, Employers and TPAs, payors, brokers and other entities, for their use or for further use by individuals.

"Consent" means any consent, approval, authorization, waiver, permit, concession, agreement, registration, or certificate of, or filing with or report or notice to, any person or entity, including but not limited to any governmental authority.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Government Entity" means any federal, state or local or foreign government or any court, administrative, arbitrative or regulatory agency or commission or other governmental authority or agency, domestic or foreign.

"including" means including without limitation.

"Intellectual Property Rights" means all rights and entitlements recognized, vested, granted, available, or existing anywhere in the world, whether through formal registration or application, by statute or otherwise, to inventions (whether patentable or not), methods, discoveries, improvements, know-how, technologies, works of authorship, mask works, information, and designs, including without limitation, patents, copyrights, trade secret rights, trademark rights, database rights, industrial property rights, moral rights, registered design rights, utility models and utility model rights, invention disclosures, and all pending applications for and registrations of any of the foregoing.

"Laws" means all applicable federal, state, local or foreign laws (including common law), codes, statutes, ordinances, orders, judgments, arbitration awards, decrees, administrative or judicial promulgations, injunctions, determinations, approvals, rules, regulations, permits, certificates, licenses and authorizations of, and agreements with, all Governmental Entities.

"Liability" or "Liabilities" means all indebtedness, obligations, duty to perform, commitments and other liabilities of a person or entity, whether absolute, accrued,

contingent (or based upon any contingency), known or unknown, fixed or otherwise, or whether due or to become due.

"Lien" means any mortgage, charge, restriction, pledge, floating charge, hypothecation, right of others, claim, security interest, imposition, encumbrance, easement, covenant, encroachment, burden, title defect, lien or right of first refusal.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a Governmental Entity.

"Proceeding" means any action, order, claim, suit, proceeding, litigation, investigation, inquiry, review, civil investigative demand, or notice of the foregoing.

"Taxes" means all taxes, assessments, charges, duties, fees, levies or other governmental charges (including interest, penalties or additions associated therewith), including income, franchise, capital stock, real property, personal property, tangible, withholding, employment, payroll, social security, unemployment compensation, disability, transfer, sales, use, excise, gross receipts, value-added and all other taxes of any kind imposed by any Government Entity, whether disputed or not, and any charges, interest or penalties imposed or that may be imposed thereon by any Government Entity.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

APPENDIX TWO

EMPLOYMENT CONTRACTS

Execution Copy

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") made as of the _____ day of July, 2010 between KePRO ACQUISITIONS, INC., a Pennsylvania business corporation ("Employer"), and DIANNA NOECKER, R.N., ("Employee").

### WITNESSETH:

WHEREAS, the Employer is acquiring substantially all of the assets of Preferred Physicians Healthcare Alliance L.C. (PPHA), a limited liability company, organized and existing under the laws of the State of Florida on or about the date of this Agreement and intends to continue a substantial part of the business of PPHA ("PPHA Business"), either as a division of the Employer or as a subsidiary of the Employer; and,

WHEREAS, the Employee has been employed by PPHA for a period of time; and

WHEREAS, the Employer believes that the services of the Employee would be of value to the Employer in connection with the continuation of the Employer of the PPHA Business; and

WHEREAS, the Employee and the Employer are willing to enter into this Agreement upon the terms and conditions herein set forth.

IN CONSIDERATION of the promises and mutual covenants herein contained, the parties agree as follows:

1.    Employment.  Employer hereby employs the Employee as Vice-President, Commercial Operations and the Employee hereby accepts such employment based on the terms and conditions of this Agreement.

2.    Term.  Employee's term of employment begins with the execution of this Agreement and shall continue for a term of two (2) years unless terminated by the Employer as provided in paragraph 6 of this Agreement.

3.    Compensation.  For all services to be rendered by the Employee, and as consideration for the other obligations of the Employee as set forth in this Agreement, the Employer will pay to the Employee a salary of $170,000 per year from the commencement of the term of this Agreement until the completion of the term of this Agreement.  This amount shall be paid to the Employee in approximately equal installments during each year on the customary payroll dates of the Employer and shall be subject to all applicable income tax withholding, deductions as required by law, and other deductions authorized by the Employee.  Employee may also be entitled to receive an annual bonus equivalent to 100% of employee's annual salary of $170,000, provided the Employee is employed by Employer on the last day of its fiscal year, in such amount, if any, as may be determined by Employer's Board of Directors, in its sole discretion, in accordance with the terms of such Bonus programs, if any, as may be in effect from time to time.

4.    Duties.  The Employee shall perform the duties outlined in Exhibit "A" to this Agreement.  The Employee shall report to the Chief Executive Officer of the Employer and to its Board of Directors.  The Employee will devote her full-time and attention to and will use her best efforts and abilities in the performance of her duties and responsibilities as described in Exhibit "A" and this Agreement and will not, without the prior written consent of Employer, engage in any trade or business for her own account or on behalf of any other person, firm or corporation which competes, conflicts, or interferes with the performance of her duties under this Agreement in any way.

2

Nothing in this paragraph shall be construed as preventing Employee from investing her assets in such former manner as will not require the performance of services by Employee in the operation of the affairs of the enterprises or companies in which the investments are made.

     5.    <u>Benefits</u>.  Employee shall be entitled to receive and participate in such qualified retirement programs, non-cash employee benefits and fringe benefits as may, from time to time, be made available by Employer to its employees on the same terms and conditions as other employees of Employer

     6.    <u>Termination</u>.

     (a)    This Agreement may be terminated by the Employer because of the inability of the Employee to perform all or a substantial portion of her duties under this Agreement by reason of illness, physical, mental or emotional disability or other lack of capacity, which inability shall continue for more than six (6) successive months.  In such event, Employer shall pay to Employee her salary at the then current rate for a period of six (6) months following termination of employment less any sums recovered by Employee for enduring this 6-month period, from any Employer-provided disability or other similar Employer-provided insurance coverage or plan.

     (b)    In addition, nothing contained in this Agreement shall be construed to prevent the Employer from terminating the employment of the Employee at any time for cause.  As used in this Agreement, termination for cause shall mean:

     (i)    any materially unprofessional, dishonest, or fraudulent conduct or conduct which is detrimental to the reputation, character, or standing of the Employer;

     (ii)    the negligence, incompetence, or moral turpitude of the Employee;

     (iii)    any failure by the Employee to adequately perform her duties under this Agreement or otherwise comply with and observe the covenants and agreements made by her in this Agreement

3

(iii)     Employee's plea of guilty or no contest to, or conviction of a felony or any professional censured;

(iv)     embezzlement or diversion of any of the Employer's funds.

7.     Non-Competition.  Employee recognizes that presently Employer's business is national in scope and the parties to this Agreement understand and agree that it is the intention of both to maintain the Employer's business activities, operations, markets and marketing activities as well as those of corporations and entities controlled by or related to or affiliated with Employer throughout the United States. Employee recognizes that Employer's business will continue to be national in scope in the future. Therefore, the parties expressly agree that during the term of this Agreement, and, in addition, for a two (2) year period following the termination if this Agreement, regardless of the reason for the termination, Employee will not, throughout the United States,

(a)     solicit or attempt to solicit customers of Employer or other persons or entities with whom or through whom Employer has done business, for the purpose of engaging in the Business; or

(b)     interfere with or detract from the PPHA Business, including by way of example and without limiting the generality of the foregoing, by inducing an Employee to leave Employer's employ, or by inducing a consultant or other independent contractor to sever that person's relationship with Employer.

(c)     "Competing Business" means any business that engages, in whole or in part, in the Utilization Management, Case Management, Disease Management, 24-Hour Nurse Hot Line, Health Screening, Health Risk Appraisal, Self Health Management Tools and other Wellness Programs to Health Care Plans, Third Party Administrators, Employers and TPAs, payors, brokers and other entities, for their use or for further use by individuals.

4

Employee acknowledges that the restrictions contained in this section are reasonable and necessary in view of the nature of Employer's business, in order to protect the legitimate interest of Employer, and that any violation thereof would result in irreparable injury to Employer. Therefore, Employee agrees that, in the event of a breach or threatened breach by Employee by the provisions of the foregoing subparagraphs, Employee shall be entitled to obtain from any court of competent jurisdiction, preliminary and permanent injunctive relief restraining Employee from violating the foregoing.

Nothing contained in this Agreement shall be construed as prohibiting Employer from pursuing any other remedies available to Employer for such breach or threatened breach, including recovery of damages from Employee, and an equitable accounting of all earnings, profits and other benefits arising from such violation.

Employer and Employee acknowledge their intention that Employer shall have the broadest possible protection of the value to Employer's business and in the trade area set forth above consistent with public policy, and it will not violate the intent of the parties if any Court should determine that, consistent with establish precedent of the forum state, the public policy of such state requires the more limited restriction and geographical area or duration of Employee's covenant not to compete, contained in an appropriate Decree.

8.     Confidentiality of Information. Employee recognizes and acknowledges that that Employee may have access to confidential information and/or trade secrets related to Employer's business. The confidential information and/or trade secrets include but are not limited to (i) all plans, systems, methods, designs, procedures, books and records including client lists and pricing information known to Employee relating to the operations, personnel and practices of Employer and of any subsidiary or affiliate of Employer; (ii) all other records, documents and information concerning Employer's or such subsidiary's or affiliate's business activities, practices

5

and procedures, and any name or style under which Employer or any such subsidiary or affiliate shall be operated during the term hereof, or shall have been operated prior hereto, and (iii) any logo or other descriptive or illustrated form thereof, utilized by Employer or such subsidiary or affiliate, as they may exist from time to time, constitute and will constitute valuable, special and unique assets of Employer's and any such subsidiary's or affiliate's business.  Except as required in the course of employment under this Agreement, Employee covenants and agrees that he will not, at any time, without Employer's prior consent, directly or indirectly, disclose to any third party or use for her own benefit, any part of such confidential information, to the extent such information has remained confidential to that time (except for unauthorized disclosures by Employee) and except as otherwise ordered by a court of competent jurisdiction.

9.      Assignment.  The obligations and duties of the Employee shall be personal and not assignable or delegable by her in any manner whatsoever.  This Agreement shall be binding upon and inure to the benefit of the Employer and it shall be assignable by the Employer to a corporation which may acquire its business, all or substantially all of the business assets of the Employer or with or into which Employer may be merged or consolidated.

10.     Entire Agreement.  This Agreement is intended by the parties to, and does, constitute the entire agreement of the parties with respect to the employment of an Employee by the Employer.  This Agreement supersedes any and all prior understandings, written or oral, between the parties with respect to the employment of the Employee by the Employer, and this Agreement may be amended, modified, waived, discharged or terminated only by an instrument in writing signed by the Employer or an authorized executive officer of the Employer, as the case may be.

11.     Arbitration.  Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the then applicable rules of the American Arbitration Association, which arbitration shall

6