12. <u>Various</u>. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as though such invalid or unenforceable provision was omitted. This Agreement shall be construed according to the laws of the Commonwealth of Pennsylvania. No amendment of this Agreement shall be effective unless in writing executed by both parties, and no waiver of any term herein shall constitute a general waiver for future purposes.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

EMPLOYER

KePRO ACQUISITIONS, INC.

ATTEST:

_[signature]_ 7/15/2010   _[signature]_ 7/15/10
President           Date              Witness            Date

DIANNA NOECKER, R.N.

_____  _____  _____  _____
Employee      Date          Witness       Date

7

528678v1

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

EMPLOYER

KEYSTONE PEER REVIEW ORGANIZATION, INC.

ATTEST:

_[signature]_    7/15/2010    _[signature]_    7/15/10
President    Date    Witness    Date

EDWARD CABRERA, M.D.

_____    _____    _____    _____
Employee    Date    Witness    Date

8

528681v1

Execution Copy

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") made as of the _____ day of July, 2010 between KEYSTONE PEER REVIEW ORGANIZATION, INC., a Pennsylvania business corporation ("Employer"), and EDWARD CABRERA, M.D., ("Employee").

WITNESSETH:

WHEREAS, the Employer has offered to have Employee as its Chief Medical Officer and Employee has accepted Employer's offer of employment; and

WHEREAS, the Employee and the Employer are willing to enter into this Agreement upon the terms and conditions herein set forth.

IN CONSIDERATION of the promises and mutual covenants herein contained, the parties agree as follows:

1. <u>Employment</u>. Employer hereby employs the Employee as Chief Medical Officer for the Employer and its subsidiaries and the Employee hereby accepts such employment based on the terms and conditions of this Agreement.

2. <u>Term</u>. The initial term of this Agreement begins _____, 2010 ("Effective Date") and ends on the date which is two (2) years thereafter ("Initial Term"). If neither party provides notice to the other at least sixty (60) days prior to the expiration of the Initial Term of an intent not to renew this Agreement, then the term of the Agreement shall automatically extend for one (1) year beyond the Initial Term. Thereafter the Agreement shall renew for additional one-year terms on each anniversary of the Effective Date, unless either party provides notice to the other of an

intent not to renew at least sixty (60) days prior to the anniversary date. This Agreement may be terminated by the Employer as provided in paragraph 6 of this Agreement.

      3.    <u>Compensation</u>. For all services to be rendered by the Employee, and as consideration for the other obligations of the Employee as set forth in this Agreement, the Employer will pay to the Employee a salary of $<u>250,000.00</u> per year from the commencement of the term of this Agreement until the completion of the term of this Agreement. This amount shall be paid to the Employee in approximately equal installments during each year on the customary payroll dates of the Employer and shall be subject to all applicable income tax withholding, deductions as required by law, and other deductions authorized by the Employee. Employee may also be entitled to receive an annual bonus equivalent to 100% of employee's annual salary of $250,000, provided the Employee is employed by Employer on the last day of its fiscal year, in such amount, if any, as may be determined by Employer's Board of Directors, in its sole discretion, in accordance with the terms of such Bonus programs, if any, as may be in effect from time to time.

      4.    <u>Duties</u>. The Employee shall perform the duties outlined in Exhibit "A" to this Agreement. The Employee shall report to the Chief Executive Officer of the Employer and to its Board of Directors. The Employee will devote his full-time and attention to and will use his best efforts and abilities in the performance of his duties and responsibilities as described in Exhibit "A" and this Agreement and will not, without the prior written consent of Employer, engage in any trade or business for his own account or on behalf of any other person, firm or corporation which competes, conflicts, or interferes with the performance of his duties under this Agreement in any way. Nothing in this paragraph shall be construed as preventing Employee from investing his assets in such former manner as will not require the performance of services by Employee in the operation of the affairs of the enterprises or companies in which the investments are made.

5.  **Benefits.** Employee shall be entitled to receive and participate in such qualified retirement programs, non-cash employee benefits and fringe benefits as may, from time to time, be made available by Employer to its employees on the same terms and conditions as other employees of Employer.

6.  **Termination.**

(a) This Agreement may be terminated by the Employer because of the inability of the Employee to perform all or a substantial portion of his duties under this Agreement by reason of illness, physical, mental or emotional disability or other lack of capacity, which inability shall continue for more than six (6) successive months. In such event, Employer shall pay to Employee his salary at the then current rate for a period of six (6) months following termination of employment less any sums recovered by Employee for enduring this 6-month period, from any Employer-provided disability or other similar Employer-provided insurance coverage or plan.

(b) In addition, nothing contained in this Agreement shall be construed to prevent the Employer from terminating the employment of the Employee at any time for cause. As used in this Agreement, termination for cause shall mean:

   (i) any materially unprofessional, dishonest, or fraudulent conduct or conduct which is detrimental to the reputation, character, or standing of the Employer;

   (ii) the negligence, incompetence, or morai turpitude of the Employee;

   (iii) any failure by the Employee to perform his duties under this Agreement or otherwise comply with and observe the covenants and agreements made by him in this Agreement

   (iii) any limitation or restriction is imposed by a governing body upon any of Employee's license(s) to practice medicine or Employee's failure to obtain and maintain all necessary licenses to practice medicine;

3

      (iv)    Employee's plea of guilty or no contest to, or conviction of a felony or any professional censured;

      (v)    embezzlement or diversion of any of the Employer's funds.

    (c)    This Agreement may also be terminated by the Employer at any time upon written notice without cause. If the Employer terminates the Employee's employment without cause, the Employer shall pay to the Employee severance compensation as follows:

      (i)    If the Employer terminates the Employee's employment without cause prior to the first anniversary of the Effective Date, the Employer shall pay the Employee severance compensation equal to six (6) months.

      (ii)    If the Employer terminates the Employee's employment without cause on or after the first anniversary of the Effective Date and on or before the second anniversary of the Effective Date, the Employer shall pay the Employee severance compensation equal to three (3) months salary.

      (iii)    No severance compensation shall be payable to the Employee if his employment is terminated by the Employer without cause after the second anniversary of the Effective Date.

    7.    <u>Non-Competition</u>. Employee recognizes that presently Employer's business is national in scope and the parties to this Agreement understand and agree that it is the intention of both to maintain the Employer's business activities, operations, markets and marketing activities as well as those of corporations and entities controlled by or related to or affiliated with Employer throughout the United States. Employee recognizes that Employer's business will continue to be national in scope in the future. Therefore, the parties expressly agree that during the term of this Agreement, and, in addition, for a two (2) year period following the termination if this Agreement, regardless of the reason for the termination, Employee will not, throughout the United States,

(a)     solicit or attempt to solicit customers of Employer or other persons or entities with whom or through whom Employer has done business, for the purpose of engaging in the Business; or

(b)     interfere with or detract from the Business, including by way of example and without limiting the generality of the foregoing, by inducing an Employee to leave Employer's employ, or by inducing a consultant or other independent contractor to sever that person's relationship with Employer.

(d)     "Competing Business" means any business that engages, in whole or in part, in the Utilization Management, Case Management, Disease Management, 24-Hour Nurse Hot Line, Health Screening, Health Risk Appraisal, Self Health Management Tools and other Wellness Programs to Health Care Plans, Third Party Administrators, Employers and TPAs, payors, brokers and other entities, for their use or for further use by individuals.

Employee acknowledges that the restrictions contained in this section are reasonable and necessary in view of the nature of Employer's business, in order to protect the legitimate interest of Employer, and that any violation thereof would result in irreparable injury to Employer. Therefore, Employee agrees that, in the event of a breach or threatened breach by Employee by the provisions of the foregoing subparagraphs, Employee shall be entitled to obtain from any court of competent jurisdiction, preliminary and permanent injunctive relief restraining Employee from violating the foregoing.

Nothing contained in this Agreement shall be construed as prohibiting Employer from pursuing any other remedies available to Employer for such breach or threatened breach, including recovery of damages from Employee, and an equitable accounting of all earnings, profits and other benefits arising from such violation.

5

Employer and Employee acknowledge their intention that Employer shall have the broadest possible protection of the value to Employer's business and in the trade area set forth above consistent with public policy, and it will not violate the intent of the parties if any Court should determine that, consistent with establish precedent of the forum state, the public policy of such state requires the more limited restriction and geographical area or duration of Employee's covenant not to compete, contained in an appropriate Decree.

8.   <u>Confidentiality of Information</u>.  Employee recognizes and acknowledges that that Employee may have access to confidential information and/or trade secrets related to Employer's business.  The confidential information and/or trade secrets include but are not limited to (i) all plans, systems, methods, designs, procedures, books and records including client lists and pricing information known to Employee relating to the operations, personnel and practices of Employer and of any subsidiary or affiliate of Employer; (ii) all other records, documents and information concerning Employer's or such subsidiary's or affiliate's business activities, practices and procedures, and any name or style under which Employer or any such subsidiary or affiliate shall be operated during the term hereof, or shall have been operated prior hereto, and (iii) any logo or other descriptive or illustrated form thereof, utilized by Employer or such subsidiary or affiliate, as they may exist from time to time, constitute and will constitute valuable, special and unique assets of Employer's and any such subsidiary's or affiliate's business.  Except as required in the course of employment under this Agreement, Employee covenants and agrees that he will not, at any time, without Employer's prior consent, directly or indirectly, disclose to any third party or use for his own benefit, any part of such confidential information, to the extent such information has remained confidential to that time (except for unauthorized disclosures by Employee) and except as otherwise ordered by a court of competent jurisdiction.

9.   <u>Assignment</u>.  The obligations and duties of the Employee shall be personal and not assignable or delegable by him in any manner whatsoever.  This

Agreement shall be binding upon and inure to the benefit of the Employer and it shall be assignable by the Employer to a corporation which may acquire its business, all or substantially all of the business assets of the Employer or with or into which Employer may be merged or consolidated.

10. **Entire Agreement**. This Agreement is intended by the parties to, and does, constitute the entire agreement of the parties with respect to the employment of an Employee by the Employer. This Agreement supersedes any and all prior understandings, written or oral, between the parties with respect to the employment of the Employee by the Employer, and this Agreement may be amended, modified, waived, discharged or terminated only by an instrument in writing signed by the Employer or an authorized executive officer of the Employer, as the case may be.

11. **Arbitration**. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the then applicable rules of the American Arbitration Association, which arbitration shall be held in Harrisburg, Pennsylvania, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

12. **Various**. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as though such invalid or unenforceable provision was omitted. This Agreement shall be construed according to the laws of the Commonwealth of Pennsylvania. No amendment of this Agreement shall be effective unless in writing executed by both parties, and no waiver of any term herein shall constitute a general waiver for future purposes.

APPENDIX THREE

CONSENT OF ASSIGNMENT NOTICES

July 12, 2010

Re: PPHA Service Agreement

Dear Mr. Falco:

    Healthcare has evolved requiring all of us to find better and more innovative ways to medically manage our population. With new mandates and changes in the way we all provide services to our clients, Physicians HealthCare Alliance ("PPHA") has diligently sought out a partner that can ensure that our clients continue to benefit from state of the art medical management resources. We are proud that joining forces with KePRO, a national medical management organization, we will provide an enhanced platform which will be necessary for the challenges we all face.

    We are pleased to inform you that PPHA will be acquired by KePRO Acquisitions, Inc. In connection with the acquisition, we request your consent to the assignment of the <u>PPHA Services Agreement that was effective July 1, 2009</u> to KePRO (including any amendments thereto) and to the assumption by KePRO of the PPHA's rights and obligations thereunder arising from and after the closing. You will continue to be serviced in the manner in which you have been accustomed to and we look forward to further discussion with you regarding additional services that we can now provide.

    We also request your confirmation that the PPHA is not in breach or default under the Agreement as of the date of this letter. KePRO has full URAC accreditation in both Utilization Management and Case Management. As part of this transition, all Utilization Management, Case Management and Disease Management programs currently provided which were developed applying URAC standards and are URAC accredited will continue to be offered. KePRO will file an application for Disease Management URAC accreditation using PPHA's DM program. Accordingly, we are also requesting that you acknowledge and agree that KePRO will be afforded the necessary time to obtain URAC accreditation as may be applicable to your contract.

    Kindly sign below indicating your consent to the assignment and assumption and reflecting your agreement that there is currently no breach or default under the Agreement. Please fax, email or mail the signed copy to our address and numbers noted above.

    We appreciate your kind consideration and prompt attention to this matter. Please call me or Dianna Noecker at 407-475-3950 with any questions.

    We are grateful for the honor of serving you and are excited about sharing how we may continue to serve your members with medical management programs designed with the sole purpose of improving clinical outcomes while simultaneously providing cost saving opportunities to our clients. Our commitment to you remains unchanged and I am sure you will find the KePRO organization fully committed as we are.

With warm regards,

Edward Cabrera, M.D., MBA, FAAFP

**Accepted and Agreed; Consent Provided:**

By: _____
      Signature

Print Name: _____

Company Name: _____

Title: _____

Date: _____

July   , 2010

**Re:**

Dear   :

    Healthcare has evolved requiring all of us to find better and more innovative ways to medically manage our population. With new mandates and changes in the way we all provide services to our clients, Physicians HealthCare Alliance ("PPHA") has diligently sought out a partner that can ensure that our clients continue to benefit from state of the art medical management resources. We are proud that joining forces with KePRO, a national medical management organization, we will provide an enhanced platform which will be necessary for the challenges we all face.

    We are pleased to inform you that PPHA has been acquired by KePRO Acquisitions, Inc., effective _____. In connection with the acquisition, we request your consent to the assignment of the _____ Agreement by PPHA to KePRO (including any amendments thereto) and to the assumption by KePRO of the PPHA's rights and obligations thereunder arising from and after the closing. You will continue to be serviced in the manner in which you have been accustomed to and we look forward to further discussion with you regarding additional services that we can now provide.

    We also request your confirmation that the PPHA is not in breach or default under the Agreement as of the date of this letter. KePRO has full URAC accreditation in both Utilization Management and Case Management. As part of this transition, all Utiliation Management, Case Management and Disease Management programs currently provided which were developed applying URAC standards and are URAC accredited will continue to be offered.

    Kindly sign below indicating your consent to the assignment and assumption and reflecting your agreement that there is currently no breach or default under the Agreement. Please fax, email or mail the signed copy to our address and numbers noted above.

    We appreciate your kind consideration and prompt attention to this matter. Please call ___ _____ at _____ with any questions.

    We are grateful for the honor of serving you and are excited about sharing how we may continue to serve your members with medical management programs designed with the sole purpose of improving clinical outcomes while simultaneously providing cost saving opportunities to our clients. Our commitment to you remains unchanged and I am sure you will find the KePRO organization fully committed as we are.

With warm regards,

Edward Cabrera, M.D., MBA, FAAFP

**Accepted and Agreed; Consent Provided:**

By: _____
      Signature

Print Name: _____

Company Name: _____

Title: _____

Date: _____

July , 2010

**Re:**

Dear :

    Healthcare has evolved requiring all of us to find better and more innovative ways to medically manage our population. With new mandates and changes in the way we all provide services to our clients, Physicians HealthCare Alliance ("PPHA") has diligently sought out a partner that can ensure that our clients continue to benefit from state of the art medical management resources. We are proud that joining forces with KePRO, a national medical management organization, we will provide an enhanced platform which will be necessary for the challenges we all face.

    We are pleased to inform you that PPHA has been acquired by KePRO Acquisitions, Inc., effective _____. In connection with the acquisition, we are notifying you of the assignment of the _____ Agreement by PPHA to KePRO (including any amendments thereto) and to the assumption by KePRO of the PPHA's rights and obligations thereunder arising from and after the closing. You will continue to be serviced in the manner in which you have been accustomed to and we look forward to further discussion with you regarding additional services that we can now provide.

    KePRO has full URAC accreditation in both Utilization Management and Case Management. As part of this transition, all Utilization Management, Case Management and Disease Management programs currently provided which were developed applying URAC standards and are URAC accredited will continue to be offered.

    We are grateful for the honor of serving you and are excited about sharing how we may continue to serve your members with medical management programs designed with the sole purpose of improving clinical outcomes while simultaneously providing cost saving opportunities to our clients. Our commitment to you remains unchanged and I am sure you will find the KePRO organization fully committed as we are.

    Please call _____ at _____ with any questions.

With warm regards,

Edward Cabrera, M.D., MBA, FAAFP

# APPENDIX FOUR

## CONFIRMATORY ASSIGNMENTS

## CONFIRMATORY ASSIGNMENT

The undersigned hereby executes and delivers this Confirmatory Assignment to Preferred Physicians Healthcare Alliance, LC ("Seller") and to KePRO Acquisitions, Inc. ("Buyer") as of the _____ day of July, 2010.

I am aware that Seller is selling to Buyer and Buyer is purchasing substantially all of the assets of the business of Seller including certain software and other Intellectual Property (IP Rights) including the Med Manager and Med Manager Mobile (M3) software. I participated in the creation of some of the assets while an employee or contractor of the Seller.

I hereby confirm that I do not have any ownership or rights in or to any of the work product created by me or to which I contributed while working for Seller (including the property listed on Attachment One hereto), and I claim no title or rights to the copyrights or other intellectual property rights that exist or may be claimed with respect to such work product or the use or implementation thereof. I also confirm that I have not filed any patent or copyright applications with respect to any such work product or the use or implementation thereof and will not do so at any time hereafter. I acknowledge that I have no entitlement to royalties or any other compensation in connection with the work product referenced above or the use or implementation thereof whether by Seller, Buyer or any of their successors or assigns.

To the extent that any ownership or intellectual property right in or to the work product referenced above or the use or implementation thereof has vested in me by operation of law or otherwise, I hereby assign all such ownership and intellectual property right to Seller, and acknowledge that Seller is assigning all such rights to Buyer. Both Seller and Buyer and their respective successors and assigns may enforce this agreement against me if I later make a claim that is inconsistent with the statements I have made herein.

I acknowledge that there is adequate and sufficient consideration for my confirmation of the understandings set forth above. I further understand that nothing in this Confirmatory Assignment narrows the scope of the assignments and intellectual property agreements I may have previously signed for the benefit of the Seller.

Edward Cabrera

Date: _____

Signature

Date: _____

Witness

## ATTACHMENT ONE

## PURCHASED ASSETS

1.2.1 The Med Manager and Med Manager Mobile ("M3") Software and all prior versions thereof by whatever name in source code and object code/compiled code, whether completed or as work in progress, and including all customized versions as described in Schedule 1.2.1 hereto and production and non-production environments and platforms of the foregoing (collectively, the "Software");

1.2.2 All health assessments, questionnaires, guidelines, clinical manuals, user manuals, data, content, content rights, content libraries, courseware, training materials, forms and templates, and health management and learning modules developed, acquired, used or held for use in connection with the Software and related end user consents (collectively, the "Content");

1.2.3 All tools, content management systems and reporting systems developed, used or held for use in connection with the Business, if any (the "Tools");

1.2.4 All web pages (dynamic or static), portals, web designs, layouts, web libraries, business rules, algorithms, database structures and designs, engines, frameworks, scripts, specifications, interfaces and links and any other technical artifact relating to any of the foregoing Purchased Assets, and all URLs and domain names held or used in connection with any of the foregoing (the "Web Artifacts"), including those on Schedule 1.2.4 hereof;

1.2.5 All work in progress by or for the Business, including any completed work and work in progress and any third party contractors for the Business or at the request of Seller (the "Work in Progress");

1.2.6 All source code, object code, compiled code and other executables relating to any of the foregoing, for all existing platforms and environments, including the current and all existing prior versions thereof, and all code annotations with respect thereto (the "Code Base");

1.2.7 All logs, manuals, documentation, maintenance and support information, development information, "as built" documentation, downloads, product descriptions, product designs, testing data, research, and other technical or engineering information and data, in whatever medium, with respect to any of the Purchased Assets ("Technical Information");

1.2.8 The business, sales and technical files, customer or prospect lists, marketing, advertising and promotional materials, incentive programs and the materials associated with them, telephone numbers and other business and technical information and associated business practices of the Business ("Business Information");

1.2.9 All existing back-ups of any of the foregoing Purchased Assets ("Back-Ups");

1.2.10 All other proprietary know-how, software and technology of Seller or a Seller Party that is developed, used or held for use principally by the Business, including any software, portals, web assets and rights acquired by Seller ("Other Technology");

1.2.11 All patches, fixes, updates, enhancements, improvements, modifications, extensions and derivative works of the Purchased Assets made or acquired by Seller, any Seller Party or their respective contractors and agents (the "Improvements");

1.2.12 Subject to any limitations set forth in Schedule 1.2.12, any brands, trademarks, logos, slogans and trade dress used in connection with the Business, including any and all existing rights to "Med Manager" and "Med Manager Mobile" in the context of the Business, and all the goodwill embodied therein ("Brands");

1.2.13 The corporate or trade name "Preferred Physicians Healthcare Alliance, L.C.";

1.2.14 All Intellectual Property Rights embodied in or attendant to any of the Purchased Assets, including trade secret rights, copyrights and rights to patentable inventions anywhere in and to the Software, the Content, the Tools, the Web Artifacts, the Code Base, the Work in Progress, and the Improvements, and any existing registrations, counsel opinions, prosecution files and governmental issuances with respect to any such Intellectual Property Rights, if any (collectively, the "IP Rights");

1.2.15 All inventions conceived, developed or first reduced to practice by or on behalf of Seller or a Seller Party, or their respective contractors and agents, relating to the Business, and the Intellectual Property Rights attendant to or embodied in any of the foregoing anywhere (the "Inventions");

1.2.16 All assignments and other grants of ownership or rights from employees and other third parties relating to any Purchased Assets or the related Intellectual Property Rights, including without limitation those set forth in Schedule 1.2.17 hereto (the "Assignments");

1.2.17 The sole and exclusive right to file for and prosecute any applications to register or protect the IP Rights, all rights to claim priority, and to hold any patents and other registrations which may be granted therefor, including any and all divisions, continuations, in whole or in part, substitutions, renewals, reissues, reexaminations, and extensions thereof, and all national, foreign counterpart and treaty applications claiming priority therefrom;

1.2.18 The exclusive and sole right to sue and receive any recoveries for any past, present and future infringement or misappropriation by others of the IP Rights or the Inventions;

1.2.19 All of the contracts, agreements, leases and similar arrangements identified on Schedule 1.2.20 hereto (the "Assigned Contracts");

1.2.20 All copies and embodiments of the foregoing Purchased Assets, including the media in which any of the Purchased Assets is embodied;

1.2.21 The Furniture, Furnishings and Equipment listed on Schedule 1.2.22 including servers, switches plus PBK, IVR, PC's, laptops, printers, copiers, phone sets and supporting software, all web servers where the code base resides (but excluding any data, content, or software which reside there that is not part of the Purchased Assets) (collectively, the "Furniture, Furnishings and Equipment"), in their existing condition; and